United States Court of Appeals,

Fifth Circuit.

No. 93-7250.

Robert TOMPKINS, Plaintiff-Appellee,

v.

Dr. Nolan VICKERS, Superintendent, et al., Defendants,

Dr. Nolan Vickers, Superintendent, Defendant-Appellant.

July 26, 1994.

Appeal from the United States District Court for the Northern District of Mississippi.

Before GOLDBERG, DAVIS and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this § 1983 action, Nolan Vickers appeals the district court's order denying his motion for summary judgment based on qualified immunity. We agree with the district court that issues of fact are presented with respect to Vickers' motivation for transferring Tompkins to a less desirable employment position. We therefore dismiss the appeal.

I.

For approximately twenty-one years, Robert Tompkins taught art at Greenville High School (Greenville) without controversy. In August 1988, Tompkins began criticizing school district Superintendent Nolan Vickers for cancelling the art program at Coleman Junior High School (Coleman), an "historically black [junior] high school." Tompkins decried the cancellation because the same art program was spared at Solomon Junior High, an "historically white junior high school". When the Vickers

administration explained that the program was cancelled because instructors could not be found for Coleman, Tompkins located art instructors for the school.

Around this same time, the Vickers administration was the subject of extensive criticism in the community. His management style was criticized by a large segment of the teachers and staff of the school district. Criticism of his vindictive and retaliatory management style was reported in the press and was the subject of discussion at school board meetings.

In September 1988, Tompkins, on behalf of a local teachers' organization, presented a letter of "no confidence" to Vickers, detailing the grievances of employees, staff and teachers. Tompkins also wrote a letter to the editor of the local newspaper, further publicizing his criticism of the Vickers administration for its poor relations with faculty, staff and students. Finally, in October 1988, Tompkins appeared before the School Board of Trustees and urged the Board to reinstate the art program at Coleman.

The following April, Charlie Lynch, the Greenville principal, recommended Tompkins for re-employment as an art instructor at Greenville.[1] However, this recommendation was revoked after a July 1989 meeting between Lynch, Mac Durastanti (the principal of Coleman) and Sammie Felton (the principal of T.L. Weston). On Vickers' instruction, the group of principals met for the avowed purpose of redistributing art instructors throughout the school

---

[1]Under school district policy, each principal made staffing recommendations for their schools each April for the coming year.

district; according to Tompkins, a meeting of this kind had never taken place before. After the meeting, the principals unanimously recommended that Tompkins be reassigned to Coleman for the upcoming school year. Vickers accepted this recommendation and ordered Tompkins' transfer. After being notified of the transfer, Tompkins requested the Board to reassign him to Greenville, but the Board denied his request.

Tompkins then filed this suit under 42 U.S.C. § 1983 against the Greenville Municipal School District, Superintendent Vickers, several other administrators and the members of the School Board of Trustees. Tompkins alleged that his reassignment to Coleman was made in retaliation for the public criticism he had expressed toward the various defendants, in violation of his First Amendment rights. Tompkins also complained that his reassignment violated his Due Process and Equal Protection rights.

All defendants moved for summary judgment on a number of grounds, including qualified immunity. The district court granted summary judgment in favor of the defendants on Tompkins' Due Process and Equal Protection claims, but denied summary judgment on Tompkins' First Amendment claim, rejecting the defendants' request for qualified immunity. Only defendant Vickers appeals the district court's denial of qualified immunity.

## II.

### A.

We review de novo the denial of a public official's motion for summary judgment predicated on qualified immunity. *Johnston v.*

*City of Houston,* 14 F.3d 1056, 1059 (5th Cir.1994) (citation omitted).

Tompkins' First Amendment claim is predicated on his contention that Vickers reassigned him to Coleman to retaliate against him for criticizing the Vickers administration on matters of public concern. Vickers argues that his actions did not violate Tompkins' clearly established constitutional rights. Vickers further contends that Tompkins was reassigned solely because of a personality conflict with Lynch, and that Tompkins has not met his summary judgment burden of establishing a causal connection between his transfer and his First Amendment activity.

In reviewing the denial of a summary judgment motion based on a claim of qualified immunity, the Supreme Court has instructed us to first consider whether the actions of the plaintiff are entitled to constitutional protection. *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Even if the plaintiff's actions are constitutionally protected, public officials are nonetheless entitled to qualified immunity unless the constitutional right asserted was clearly established at the time of their conduct. The law is considered clearly established if the contours of the right asserted are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Texas Faculty Ass'n v. University of Texas at Dallas,* 946 F.2d 379, 389 (5th Cir.1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

The parties do not dispute that the First Amendment prohibits

4

a public employer from retaliating against an employee for exercising his right to speak on a matter of public concern. Nor do the parties dispute whether the contours of this right were clearly established at the time of Tompkins' transfer. However, Vickers contends that it was not clearly established that Tompkins' speech addressed a matter of public concern because the statements were arguably motivated by Tompkins' personal interests as an employee. Whether the speech at issue relates to a matter of public concern is a question of law to be resolved by the court. *Rankin v. McPherson,* 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 2898 n. 9, 97 L.Ed.2d 315 (1987).

In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), a public employee, disgruntled by an undesirable transfer, complained that she was terminated because of statements pertaining to the office transfer policy, the need for a grievance committee, and the level of confidence in various supervisors. In distinguishing between speech relating only to the employee's personal interests and speech relating to a matter of public concern, *Connick* instructs us to look to "the content, form, and context of [the speech at issue], as revealed by the whole record." *Id.* at 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d at 720. The *Connick* Court interpreted the public employee's statements as "mere extensions of [her] dispute over her transfer," which were not "of public import in evaluating the performance of ... an elected official." Accordingly, the Court declined to afford First Amendment protection because the employee had spoken "not as a

citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Id.*

We are persuaded that Tompkins' complaints about cancelling the art program at a black junior high school for no apparent reason while maintaining the art program at a white junior high school relates to a matter of public concern. This conclusion is strengthened by the content, form and context of Tompkins' complaints. *See id.* Tompkins' complaints were made against a backdrop of widespread debate in the Greenville community regarding the art program and other aspects of Vickers' management of the school system. Thus, Tompkins' complaints can be seen "in the context of a continuing commentary that had originated in [a] public forum." *See Brawner v. City of Richardson,* 855 F.2d 187, 192 (5th Cir.1988). In fact, most of Tompkins' complaints were made in a public forum. He wrote a letter to the editor of the local newspaper criticizing the Vickers administration. This criticism continued at a public meeting of the local School Board, where Tompkins urged the Board to reinstate the art program at Coleman. *See id.* Moreover, Tompkins, on at least one occasion, spoke not only on his behalf, but as a representative of a local teachers' organization.

Vickers' only specific argument that Tompkins did not engage in public speech is that Tompkins spoke out as an employee on a matter of solely personal interest. Specifically, Vickers contends that Tompkins stood to benefit personally from the continuation of the art program at Coleman because his Greenville students would be

6

better prepared for high school art classes.  Vickers points to no record support for this argument and we find it unpersuasive.  The district court correctly concluded that Tompkins engaged in protected public speech.[2]

B.

Vickers argues next that, even if Tompkins' speech is constitutionally protected, his claim must still suffer early dismissal on qualified immunity grounds because Tompkins did not meet his summary judgment burden of establishing that he was transferred because of his speech.  Vickers contends that Tompkins has not met his summary judgment burden because he did not produce specific, direct proof that Vickers had an unconstitutional motive in transferring Tompkins to Coleman.

Vickers correctly points out that in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court expressly discarded the subjective component of the qualified immunity test.  The Court held that the public official's state of mind was generally no longer relevant in deciding a claim of qualified immunity.  By shifting the focus of the qualified immunity defense to the objective reasonableness of the official's

_____

[2]Once a court determines that the employee's speech relates to a matter of public concern, the court must then weigh the interests of the employee as a citizen in commenting upon the matter of public concern against the public employer's interest in promoting the efficiency of the public services it performs. *See, e.g., Connick,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. The district court struck the balance in this case in favor of the employee, Tompkins, because Vickers had failed to present any evidence that Tompkins' speech impeded the operation or effectiveness of his administration.  Vickers does not challenge this conclusion on appeal.

7

conduct, the Court balanced the need to provide redress for constitutional violations with the desire to shield public officials from undue interference with their duties. The Court sought to protect public officials from the costs that attend "[j]udicial inquiry into subjective motivation" by affording not only immunity from liability, but also immunity from suit. *Id.* at 817, 102 S.Ct. at 2737. Under *Harlow,* therefore, the focus of an inquiry into a defendant's qualified immunity is ordinarily the "objective reasonableness" of the official's discretionary conduct as measured by reference to clearly established law. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

But in *Harlow,* the public official's state of mind was not an essential element of the underlying constitutional violation. Every Circuit that has considered the question has concluded that a public official's motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation. *See, e.g., Branch v. Tunnell,* 937 F.2d 1382 (9th Cir.1991); *Siegert v. Gilley,* 895 F.2d 797 (D.C.Cir.1990), *aff'd on other grounds,* 500 U.S. 226, 235, 111 S.Ct. 1789, 1795, 114 L.Ed.2d 277, 289 (1991); *Pueblo Neighborhood Health Centers v. Losavio,* 847 F.2d 642, 648 (10th Cir.1988); *Poe v. Haydon,* 853 F.2d 418 (6th Cir.1988); *Gutierrez v. Municipal Ct. of Southeast Judicial Dist.,* 838 F.2d 1031 (9th Cir.1988); *Musso v. Hourigan,* 836 F.2d 736, 743 (2d Cir.1988) ("*Harlow* does not require us ... to ignore the fact that

8

intent is an element of the relevant cause of action."); see also Balcerzak, Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation, 95 Yale L.J. 126, 127 (1985).

Vickers does not seriously contend that his motive in transferring Tompkins is irrelevant. He argues, however, that a public official's burden of defending his subjective motivation in taking discretionary action should be diminished in light of the policies underlying qualified immunity. Vickers contends that this diminished burden would best be achieved by a bright-line rule requiring Tompkins to present direct evidence, as opposed to circumstantial evidence, that Vickers was motivated by a desire to retaliate against Tompkins for his criticism. Additionally, Vickers advocates a heightened requirement of proof for a plaintiff seeking to overcome a motion for summary judgment on a cause of action embodying the public official's state of mind.

We agree that a public official's qualified immunity defense should not be defeated simply because the plaintiff alleges a claim that hinges on the requisite state of mind of the public official. Some protection must be afforded against groundless claims, otherwise the burden *Harlow* sought to abate would be inescapable and qualified immunity rendered a hoax. *See Pueblo,* 847 F.2d at 648.

But we are convinced that the requirements of Rule 56 accommodate the interests of public officials seeking protection from groundless claims as well as the interests of plaintiffs

seeking vindication of constitutional rights. The Supreme Court has made clear that a party moving for summary judgment has no burden to disprove unsupported claims of an opponent. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Application of this rule is especially important "when, as in the area of concern in this case, the reasons for swiftly terminating insubstantial lawsuits are particularly strong." See *Pueblo,* 847 F.2d at 649 (quoting *Martin v. D.C. Metropolitan Police Dept.,* 812 F.2d 1425 (D.C.Cir.1987) (Ginsburg, J.)). At the summary judgment stage, Tompkins cannot rely on allegations; he must produce specific support for his claim of unconstitutional motive. *Id.; see also Siegert v. Gilley,* 500 U.S. 226, 235, 111 S.Ct. 1789, 1795, 114 L.Ed.2d 277, 289 (1991) (Kennedy, J., concurring) (the plaintiff must produce "specific, nonconclusory factual allegations which establish [the necessary mental state], or face dismissal.")

As the Seventh Circuit recognized in *Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir.1991):

> [i]f a rule of law crafted to carry out the promise of *Harlow* requires the plaintiff to produce some evidence, and the plaintiff fails to do so, then Rule 56(c) allows the court to grant the motion for summary judgment without ado.

*See also Pueblo,* 847 F.2d at 649.

We are not persuaded, however, that this requirement obligates the plaintiff to come forward with direct, as opposed to circumstantial, evidence. We are guided in this regard by Justice Kennedy's concurrence in *Siegert,* 500 U.S. at 235, 111 S.Ct. at 1795. In *Siegert,* the Court of Appeals held that where

10

illegitimate intent is an element of the underlying constitutional violation, the plaintiff, to defeat a motion to dismiss on grounds of qualified immunity, must satisfy a "heightened pleading standard" by alleging specific, direct evidence of illicit intent.[3] *Siegert,* 895 F.2d 797, 802 (D.C.Cir.1990). The Court of Appeals concluded that the plaintiff's allegations of improper motive were insufficient to overcome the defendant public official's assertion of qualified immunity. *Id.* at 803-04.

The Supreme Court granted certiorari to "clarify the analytical structure under which a claim of qualified immunity should be addressed." *Siegert,* 500 U.S. at 226, 111 S.Ct. at 1789. The Majority concluded that the plaintiff's complaint "failed to satisfy the first inquiry in the examination of ... a [qualified immunity] claim" because it "failed to allege the violation of a clearly established constitutional right."

Although the Majority took no occasion to address the Court of Appeals' direct evidence requirement, Justice Kennedy, concurring, rejected the notion "that a plaintiff must present direct, as opposed to circumstantial evidence" of an illegitimate intent in order to overcome a public official's claim of qualified immunity. *Id.* 500 U.S. at 235, 111 S.Ct. at 1795; contra *Siegert,* 895 F.2d

---

[3]This case has already proceeded to the summary judgment stage, so we have no occasion to discuss a plaintiff's pleading requirements where motive or intent is an essential element of the clearly established right, an issue which we recognize may be affected by the Supreme Court's recent decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. ----, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). As Judge Easterbrook wrote in *Elliott,* 937 F.2d at 345, "[n]othing we say here affects what the plaintiff must put in his complaint."

11

at 802, *aff'd on other grounds,* 500 U.S. 226, 111 S.Ct. 1789; *Poe,* 853 F.2d at 430.  Three other members of the *Siegert* Court also expressly rejected the District of Columbia Circuit's direct evidence requirement.  *Siegert,* 500 U.S. at 238, 111 S.Ct. at 1797 (Marshall, Blackmun, and Stevens, J.J., dissenting in part).  Since the Supreme Court's opinion in *Siegert,* every Circuit that has considered the question has concluded that a plaintiff is not required to come forward with direct, as opposed to circumstantial, evidence under these circumstances.  *See Branch,* 937 F.2d at 1387 ("we are unwilling to require a plaintiff to present direct evidence of [illegitimate] intent in order to avert dismissal); *Elliott,* 937 F.2d at 345.

We agree with those Circuits that have rejected the argument that a plaintiff must produce direct evidence in a case such as this.  Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent.  Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain.  Thus, requiring direct evidence would effectively insulate from suit public officials who deny an improper motive in cases such as this.  See *Siegert,* 500 U.S. at 235, 111 S.Ct. at 1795 (Kennedy, J. concurring);  *Branch,* 937 F.2d at 1386-87 (motion to dismiss);  *Elliott,* 937 F.2d at 345.

## C.

In light of these standards, we turn now to the question of whether Tompkins presented sufficient evidence of an unconstitutional motive to overcome summary judgment.  The district

12

court found the uncontroverted circumstances surrounding Tompkins' transfer sufficient to raise a genuine issue of material fact. We agree.

The dispute in this case surrounding the cancellation of the art program at Coleman was widely publicized, as were many other general complaints against the Vickers administration during the 1989-90 school year. Tompkins openly participated in this protest by personally delivering the letter of "no confidence" to Vickers, by penning a letter to the editor of the local newspaper and by appearing before the Board to air complaints against the Vickers administration. Prior to these protestations, Tompkins had never been reprimanded during his 21 years of employment with the school district. Lynch conceded in his deposition that Tompkins' personnel file contained no reprimands. Moreover, Tompkins was an accomplished artist, held in high regard as an art teacher by faculty and students. Lynch acknowledged that Tompkins' teaching evaluations were above average and that several of Tompkins' art students had received outstanding achievement awards.

Vickers counters with evidence that Tompkins' transfer was prompted by a personality conflict between Lynch and Tompkins; Vickers also points out that the initial recommendation to transfer Tompkins resulted from a private meeting between the three principals—a meeting which Vickers did not attend. But, Tompkins presented evidence that Lynch had originally recommended Tompkins for reemployment at Greenville; the reassignment recommendation came after Vickers took the unprecedented step of requiring the

principals to meet to redistribute the art instructors. Moreover, Vickers was present at a second meeting to discuss the transfer with Tompkins and the three principals. During this second meeting, Tompkins alleges that when he objected to the transfer, Vickers responded: "Well, I thought you'd want to go to Coleman as much fuss as you kicked up over this." Finally, Lynch conceded that he knew of no other instances where a teacher had been transferred to another school because of a personality conflict with the principal.

We are persuaded that the summary judgment record supports the district court's conclusion that a genuine factual dispute surrounds Vickers' motivation for approving Tompkins' transfer. Thus, we dismiss Vickers' appeal for want of jurisdiction. *See Lion Boulos v. Wilson,* 834 F.2d 504, 509 (5th Cir.1987).

APPEAL DISMISSED.

14